May it please the court, my name is Debbie Whittle-Durban and I'm representing the appellant in this case, Knight Enterprises S.E., who is appealing the district court's denial of its motion to compel arbitration. For ease of distinguishing between the parties, I'm going to call Knight Enterprises S.E. Knight and the parent company, Jeffrey Knight, Inc., Jeffrey Knight, because they both do business as Knight Enterprises. So hopefully that will help keep it separate. As a little bit of background, Knight hired the appellee, Mr. Weckesser, to be a cable installer. And as a condition of Knight's engagement of Mr. Weckesser, he signed an independent contractor services agreement, along with several other related agreements at the same time, including an arbitration rider. When Weckesser filed this lawsuit alleging claims under the Fair Labor Standards Act and the State Wage Payment Act, Knight moved to compel arbitration and the district court denied it. So we are appealing this on several grounds. First, we believe that the district court erred when it refused to correct a mistake, a clerical mistake in the arbitration rider and failed to reform that arbitration of the party. How do we know what the plaintiff's intention? Well, when you look at the arbitration rider itself, it states in the first line, it's between the plaintiff, Mr. Weckesser, or the appellee, and Jeffrey Knight, Inc., Jeffrey Knight, the parent company. But the second sentence of the arbitration rider states that it is in addition to the must refer to Knight and Mr. Weckesser because Jeffrey Knight was not a party to the independent contractor services agreement. In addition, the arbitration rider discusses the types of disputes that can be arbitrated, and it all includes disputes that would be with Knight, not with Jeffrey Knight, because Mr. Weckesser never worked for Jeffrey Knight, he was never paid by Jeffrey Knight. So he'd have no claims to ever arbitrate with Jeffrey Knight at all. So if you construed the contract to be with Jeffrey Knight, it would be illusory because there would be nothing there to arbitrate. So we believe the intent of the parties had to be that Mr. Weckesser was going to arbitrate his claims with the person he worked for, and that's Knight. What about the fact that in the service agreement there appeared to be a waiver of a jury trial, which suggests that perhaps the parties intended to limit their litigation rights in that document, but not necessarily the arbitration agreement? Well, I think in the independent services contractor agreement, it says that it is, you know, it along with the related agreements signed by Mr. Weckesser is the complete agreement of the parties. So I think it refers to the arbitration rider in the independent contractor services agreement. So that's one of our arguments, that it has, you know, should be incorporated by reference in there. And I'm not sure that just waiving a jury right... Just tell me where, I'm at JA 23, where does it do that? Okay, the... It's not exhibit A, right? That was exhibit B, it starts at 26... No, no, no, no, no, no, the reference. The reference in this to exhibit A is not to this arbitration rider and class action waiver. Join appendix 25, paragraph 13, and 13A says this agreement together with its related written documents. Yeah, but it doesn't tell you what they are. I mean, that's fine, that's your argument. Well, and Mr. Weckesser did state in his complaint and in his brief that he signed the arbitration rider along with 25 pages of other documents at the same time as he signed the independent services agreement. They were signed at the same time, there's no doubt about that. The question is whether the same parties signed them. Well, certainly, and we contend that there was nothing but a scrivener's error, a clerical error that misnamed the party in the first paragraph, in the first sentence of the arbitration rider. Well, the only case that dealt with this, at least in South Carolina, that Judge Gergel relied on dealt with the scenario where the scrivener's error clearly identified a party that didn't exist, but that's not what we have here. That's correct, and Cobb versus Cobb and Seale, in the Cobb and Seale's case, Judge Gergel did rely on the fact that the misnomer did not identify a legal party, but that's not all the court relied on. The court also relied on the fact that the insurance agent that sold that policy knew who the correct party was. So when you look at all the circumstances surrounding it, because the parties know who they are contracting with, what the parties are named doesn't really matter, and that case says a contract is good between the parties, no matter how incorrect the names are used, if it appears that they were intended as names of the parties. So I would argue that Mr. Wexler knew that when he was signing the arbitration rider, in fact, a rider is a document that is appended to another document. You may be attaching a lot more attention to what the plaintiff knew than he actually did. He was handed a blizzard of documents. He was told to sign them. He probably didn't have any clue what he was doing. Well, perhaps he might, but he is still charged with knowing what he signed, and he did sign it. Yes, and his clients, and that is plural, are charged with knowing what they signed, and they did sign. Each signed a different agreement here. Well, that's true. They are more sophisticated people, presumably, than the plaintiff here. Certainly. Mr. Vaughan, who signed it for my, and I only have one client here, Knight. I don't represent Jeffrey Knight, at all, but Mr. Vaughan signed it in his capacity as Director of Compliance for Knight, and he said under oath in his declaration that he signed it in his capacity as working for Knight, and that it was a clerical error. It was a mistake that no one could contend. I mean, Mr. Wexler couldn't. That's how you would determine. I mean, you have other arguments, but that's how you would determine a Scrivner error, just by looking at what Scrivner said. There wouldn't be a resolution that a court would make, right? Well, you would always get to say, well, I wrote the contract, and this is what it meant, and if it says something else, it's just a Scrivner's error. But there's an ambiguity in that arbitration, Ryder, because Well, to begin with, you know, if the Ryder is between Jeffrey Knight, the parent, and Mr. Wexler, it has no force and effect, because the arbitrable disputes are never a dispute that Mr. Wexler could ever have with Jeffrey Knight, because they are strangers. Mr. Wexler doesn't know Jeffrey Knight, nor he them. So, what's the reach of the arbitration agreement, is it limited to disputes arising under the service agreement? Arising under the service agreement, arising due to the compensation that is paid to Mr. Wexler for the services that he performed for Knight, and any federal, state, and local laws, including employment and labor laws. And of course, he never did any work for Jeffrey Knight, so none of those laws would apply. So, that's the reach of the arbitrable disputes in the arbitration, Ryder. So, we really think that the intent of the parties is shown by the language in the arbitration, Ryder, has to be that they are going to arbitrate the disputes that arise between Mr. Wexler and Knight, because those are the only disputes that are arbitrable. And to construe it otherwise would make it a nullity. It wouldn't have any effect or meaning or make any sense. We have some other arguments, as you noted, that equity law would allow that Knight could enforce this arbitration, Ryder, against Mr. Wexler. One of these is that we believe that the arbitration, Ryder, was incorporated by reference into the independent services agreement. Not only does the independent contractor services agreement refer to the arbitration, to other documents, but the arbitration, Ryder, refers to the independent services agreement. We also think that Knight is the logical third-party beneficiary of an agreement. If he can't be enforced as a signatory to the agreement, then the agreement had to be for the benefit of Knight, not of Jeffrey Knight, because Jeffrey Knight gets absolutely no benefit from the arbitration agreement. The court distinguished that a little bit because it said that Knight was not ever referred to in the arbitration agreement, but that's not the standard in South Carolina. Plenty of cases have held that even if the third-party beneficiary isn't named, they can, if it's the party that the benefit's inured to, then it is a proper third-party beneficiary, and we believe that applies to Knight. And we also think that because the documents should be read together, that Knight has, you know, he got a benefit from both documents. He got to work for, Wexler got a benefit from both documents. He got to work for Knight because he signed the arbitration, Ryder, and the other contract. He got paid by Knight, so he should be stopped from claiming that the arbitration agreement doesn't apply to him. Can I get you back to the arbitration, Ryder? You said, and I think you may have misspoken, that the breadth of the dispute was limited to any violations of state or local law relating to the employment agreement, but if you look at subsection D, I'm sorry, subsection E of the arbitration, Ryder, it says any claim by Knight or contractor under any federal, state, or local law, as used herein, the types of laws covered by this, Ryder, are to be interpreted broadly. I mean, I get you when you say that it doesn't, it stretches logic to suggest that he would have a claim, an employment dispute claim with respect to the parent company, but we live in a litigious society. There are all kinds of claims that can be processed and litigated. Why wouldn't the parent perhaps be interested in limiting the scope of its liability by insisting on arbitration? Because it was a total stranger to Mr. Weckeser. I mean, you're telling us. Well, Mr. Weckeser maybe will testify differently, but I don't believe so, because I don't believe they had any relationship. Well, he may be a stranger, but there's a relationship between the subsidiary and the parent, so that's at least relevant. I mean, there are a lot of times when you go against a parent because it's the deep pockets. And you don't want to go against a subsidiary. You know, that's why people create different corporations. Certainly. I don't think there's been any allegations so far that there's any type of joint employment relationship between the parent and the subsidiary or anything like that. You know, he didn't bring the parent into this lawsuit. I don't think you're understanding my argument. So suppose you, I don't know the claim, but suppose that he doesn't think that the parent, it's not a contract claim. It's a sort, and he wants to bring it against the parent. And that's possible. Well, certainly it's possible. I mean, he may get hit by a truck being run by the parent in some, you know, you certainly, I would have to agree that's possible. But to go back to Judge Diaz, and I was looking, I guess, at subsection F where it mentions the labor and employment laws on the arbitration matter. Because it includes all claims by the contractor under the labor, employment, and civil rights laws. All right. Any other questions? If not, I will. Good morning, and may it please the court. My name is Scott Falls, and I represent Patrick Weckeser, the appellee here. I want to follow up on some questions that were just asked. I think this is a good point regarding whether or not this arbitration agreement would have any meaning if we read it as it's written. And appellant's argument that the arbitration agreement is rendered meaningless unless we substitute the defendant in this case out for Jeffrey Knight, Inc., which is in the agreement, is not necessarily true. Jeffrey Knight is a separate legal entity. Jeffrey Knight, Inc. is. And it's an entity incorporated in Florida. And it's the parent company of this, of the defendant here. And the district court placed significant weight on that issue. What issue? The fact that they're a parent or the fact that they're incorporated? The fact that it's an actual entity. And that's how it was differentiated from Cobb and Seale. One of the reasons it was differentiated from Cobb and Seale. Because in that case, it was. It's not a misnomer, in other words. Well, no, I don't think it's a simple Scrivener's error. And I'll give you another reason why. If you actually, if you look at the arbitration agreement, if you look at JA 27, and it's the second paragraph, it contains a form selection clause in there. And that form selection clause says that any arbitration will take place in Tampa, Florida. Tampa, Florida just so happens to be where Jeffrey Knight, Inc. is located in that area. The person that signed this agreement, the entity. The other entity, yes, Your Honor. And Knight Enterprises SE LLC is a South Carolina limited liability company. And Mr. Weckeser is a South Carolina individual who worked for them in South Carolina. And the acts that gave cause to the claims here occurred in South Carolina. So for them to go to Florida to arbitrate doesn't really make a lot of sense there. And so it's not rendered a nullity or meaningless just because, unless we flip these names out. Another point I would like to make is, if Jeffrey Knight, I'm sorry, if Knight Enterprises SE was meant to be a third party beneficiary, it needs to be delineated in the contract. And that's what South Carolina law requires. And you see this a lot. You see something like Jeffrey Knight, Inc. and its parents, affiliates, subsidiaries, et cetera. Language to that effect. They would have a better argument if that were here, but it's not. And the district court put weight on that as well. That that language was glaringly missing here. Another concern the district court had was the ability of the non-signatory company here, not the defendant here, to be able to use an arbitration clause as both a sword and a shield basically. To disclaim it if they don't want to be, if they're getting sued. I'm sorry, to disclaim it if they're doing the suing, and then claim the benefit of it if they're getting sued. And that's one of the problems with non-signatories being able to enforce arbitration agreements. And I think that's why we have this framework to allow them to do that. And that's equitable estoppel and these other frameworks. But they don't apply here. They just don't apply here. The district court expressed skepticism that WECA is going to force Knight into Knight Enterprises into arbitration. I'm sorry, Jeffrey Knight, Inc. into arbitration. And I think that's a consideration here. On them signing, on the clutch test, we call it in South Carolina, which is a sort of merger issue. This, in order for equitable estoppel to apply or to consider these together, we have to have a merger basically. And as the district court held, these documents were not executed by the same parties or for the same purpose. So they could not be merged. And if you look at it, a close examination of the two different contracts sort of indicates the differences here. If the services agreement, for example, says it may be terminated by either party with or without cause on 30 days notice to the other. And that's JA 24 at number six. The arbitration agreement, however, says it cannot be revoked or modified except by a writing signed by the president or CEO of Jeffrey Knight, Inc. And that's at JA 27, the last paragraph, sentence two. The South Carolina Supreme Court has considered these types of issues when contemplating whether documents emerged under the clutch test. Differences in the language, differences in the way that contracts can be modified or things like that. And it does not indicate that there's a merger. And I'll give you a site on that. I don't believe we put this. I don't believe this was in our brief. But it's a South Carolina Supreme Court case, Coleman versus Mariner Health Care. And it's 407 SC 346. That's 2014. Could you give me an example of how your client could end up in a lawsuit against Jeffrey Knight? I can think of some theoretical examples. Well, as the court held, this court held not too long ago, Title VII's reach is pretty broad for joint employers. So it's not unfathomable or even inconceivable that there would be two entities sued here. And that they could be on the hook for, say, a Title VII violation. The parent and subsidiary. Is the agreement limited to labor? I don't read it that way. I read it as anything arising out of the agreement or the relationship or... Is injured on the job. Right. I think that would be included. Can I ask you, you know, this is about the joint execution theory. Sure. The same parties. Well, there's an argument about whether the same parties. So we'll pass that. But when we go to the same purpose question, is that a question of law or a question of fact? Good question. I think that would probably be a question of law. Because, and you would look at the documents to see what the purpose of each is. And one, as the district court held, is for alternative dispute resolution. And the other is for laying out the contours of the relationship. OK. So if that's the case, then we go and look at the documents ourselves. And so what's your best case to support your argument? See, if you'd said it was a factual question, then we would defer to the district court on that. Oh, I see. But you said it's a legal question. I said it was a good question. I said it was a good question. Well, yeah, I mean, I guess it could be both, maybe. I'm not sure. What is the best North Carolina case you have about South Carolina? I beg your pardon. That this is not the same purpose. I would look to the case I cited just a minute ago, the South Carolina Supreme Court case, Coleman v. Mariner Healthcare, Inc. Is that the one you didn't cite in your briefs? I don't believe I did. OK. That's fine. I don't believe I did. But that one talks about, actually, an arbitration agreement. It's sort of a reverse situation because it's a non-signatory plaintiff. And it's a nursing home case in that context. And they're talking about merger. And they're talking about an entirety of the agreement clause being in the admissions agreement to the nursing home. And they said that if you have an entirety of the agreement clause, that indicates that it's the entirety of the agreement. And then if you have an Exhibit A and an Exhibit B laid out on there and identified in that main agreement, but the arbitration agreement is not listed as an Exhibit A or Exhibit B, that tends to show that there was no merger intended. And that's the situation we have here. I mean, you have an Exhibit A and an Exhibit B, but neither one of them is the arbitration agreement. And Appellant is saying the related documents includes that. And it's just obvious that it includes that. But it's not. And especially when you have different parties listed on them. Mr. Falls, the introduction to the arbitration agreement says that, quote, it's an addition to the terms of the independent contractor services agreement between the parties. Doesn't that suggest that between the parties is talking to, talking about the subsidiary and your client? Well, the district court considered that also. And I believe it's footnote number six in the order. And Judge Gergel said he could possibly conceivably interpret it that way. But those three words are not enough to, quote, if they did create an ambiguity, that they should not be held against, the ambiguity should not be held against the party not responsible for drafting the agreement. That's Mr. Wackeser here. Well, what's ambiguous about that? Well, I don't necessarily find it to be ambiguous. Well, I guess, yes. The thing that's, I guess, ambiguous is who the parties are. Because, okay, it's an addition to a contract between these parties, but there is no other contract between these parties. The independent contractor services contract is between different parties. I mean, I guess that's the argument anyway. If it were conceived that way. But it's the three words the court did not think were enough. I remember Holly on the other side even told us she doesn't represent. I mean, she has nothing to do. These two parties are totally different, even though they have similar names. So just, you know, that would be your interpretation, that there is no independent contractor services agreement between the parties to this arbitration writer. But it could be referring to the other. Yes, it could be. But the ambiguity should not be construed against the employee here, because he had nothing to do with this. I mean, he's given a packet. And I'm not sure who drafted it over on the appellant side, but we didn't draft it. Or get the chance to revise it. Mr. Pauls, how many documents were signed? I don't have a complete answer to that off the top of my head, but I believe there were 25 pages, a lot of them. In the record, how many different documents were signed? How many different ones? I am not sure the number of documents is in the record, but the number of pages is. I know we have the services agreement, the arbitration agreement. Your opponent says it's a 25-page packet of other documents to sign, but there's no evidence in the record as to how many different documents were signed. I'm not sure what... At the same time as these others. It's not in the record, Your Honor. It's not in the record, but I don't believe it is off the top of my head. These two documents are, as documents go, pretty short. Right. So if there were 25 pages, it would sort of suggest that a lot of other agreements. You didn't have to sign each page, right? Each page, no. Sometimes, you know, in contracts you have to... No, Your Honor, you didn't have to sign each page, but one thing you did have to do was sign each, the arbitration agreement. Each document. And the service agreement. And that's something in the case I gave a minute ago, the South Carolina Supreme Court case, they took into consideration for not allowing merger of an arbitration agreement and an underlying agreement, was that you had different signature pages on the different documents. There was no issue of identity of the company there or anything. So, but they took that into consideration still and saying that there was no merger under the clutz test. So, and one other thing along those same lines, I mentioned the revocation language and the entirety of the contract clause. I believe I mentioned that. That's at SA... I'm sorry, JA 25 number 13. It says the services agreement contains the entire understanding maturities with respect to matter set forth herein. And the Supreme Court, in the case I mentioned, they used that as a factor in saying that there was no merger because if this contains the entire understanding and mentions exists and the arbitration agreement is not one of them, then it's not going to be merged. Mm-hmm. So, and for equitable estoppel to apply, they would have to have a merger of these documents. But on the... One other thing is we've been talking about the presumption of arbitration and stuff and I don't think that applies here. I think because talking about whether a contract is formed between the parties, not the scope of an arbitration clause. And, but I think the one that would apply is the South Carolina doctrine that any ambiguity, if there is any, would need to be construed against the party who was not responsible for drafting. And I was looking at this last night and I found a good quote from South Carolina Supreme Court that I didn't put in the brief, but I just wanted to read it. It's from Basel versus Green Tree Financial Court. And that's 351 SC 244. And it says, if the terms of a contract are clear and unambiguous, this court must enforce the contract according to its terms, regardless of its wisdom or folly. Ambiguous language in a contract, however, should be construed liberally and interpreted strongly in favor of the non-drafting party. After all, the drafting party has a greater opportunity to prevent mistakes and mean. It is responsible for any ambiguity and should be the one to suffer from its shortcomings. And I think that that applies here if there's an ambiguity. I don't think there is one, though. But it would need to be construed against the drafter. But the appellant's basically asking the court to rewrite this arbitration agreement. That's what they're asking the court to do. But it's clear on its face. And, you know, words matter in a contract. And I would submit that the most important term contract of the parties, the parties of the contract. But, and with third-party beneficiary, there are some cases that appellant refers to, to the effect that you don't have to be, a third-party beneficiary does not have to be expressly named. But there needs to be some indication in the document that it's meant to benefit a third party. And whether that's by category, as I mentioned earlier, with, you know, affiliates or subsidiary language. Of course, our district courts held that doesn't get you there always. And the sticky fingers v. Huffman case. But that would be what would, that would give them a better argument. Because there would be something to identify the third-party beneficiary if there is one. But, um. You don't have to use up all your time. I, I, unless, unless your honors have any further questions. I don't think we have any more questions. Thank you very much. Ms. Thurman, is the, I'll let you get settled there. But is the reference in the arbitration agreement to Tampa, Florida as a venue choice and Florida as the choice of law also a clerical error? Um, there's no, I don't know, honestly, that question. I do know that the arbitration rider is severable. So if a court was to find that that was an unconscionable term, it could be severed from the arbitration rider. And I will say it's a venue provision, not a choice of law provision. South Carolina, the law that would apply to the contract would apply whether it was in arbitration took place in South Carolina or in Florida. No, no, no. It says there's also a choice of law. Is there? It's down the 1, 2, 3, 4, 5th paragraph. It says the substantive law that would be binding on a state or federal court here in the same dispute in Tampa, Florida will be used to resolve the dispute. And that would be what the substantive law would be for court in Florida. But if the contract is formed in South Carolina, if the parties are in South Carolina, then a Florida court would most probably, in a conflict of law situation, apply a South Carolina law. I don't think that's what you said originally, but go ahead. OK, so that's what I meant was that it doesn't say that you have to apply a Florida law to- Well, you have to start with the Florida law. And then maybe you get to Maryland law. Maybe everything happened in Maryland. I think whichever state has the closest nexus to the contract. That's where that would be. But you understand the choice of law. Let me address a little bit about the presumption of arbitrability. And I will quote a case from this court, the Washington Square versus Yon case that says- That is if you have an arbitration contract. Well, and we agree. And I would- If his claim is he doesn't have an arbitration contract with your client or with, I don't know which entity you now represent. I represent Knight. And there is an arbitration agreement, a valid agreement, between Wechsler and Jeffrey Knight. No one has said that that agreement's not valid. So I would say that there's an ambiguity in that agreement. And in your Washington Square case, if there's an ambiguity, you apply the presumption of arbitrability to it. And we think the district court erred in doing that because we think there is certainly an ambiguity in who the parties are. I mean, you can't have- You know, it says the parties to the independent services contract agreement. Well, that's not who are the parties that sign- that are stated in the first sentence of the arbitration rider. So I did want to address that because I think you- The agreement, the independent contractor services agreement, has a whole bunch of explanation at the end about what happens when this goes to a court. This agreement shall not be construed more- if it is determined by the court to do this and that you shall agree on a judicial determination, all of which would suggest arbitration doesn't apply. Because there's a waiver there of the jury? Is that what you're saying? Well, it just- Why would they need to be talking about judicial proceedings if this was to be arbitrated? I don't know. I don't know either. I don't know that, but I do know when we went back, and I do think it's in the record that Mr. Weckers has said he signed documents, 25 pages of document, as a condition of his working for night. Those documents, if he had not signed the arbitration rider, he wouldn't be working for night, and he wouldn't have gotten the benefit of that work or the compensation for that work if he hadn't signed the other contract. He was happy to sign it, but he didn't sign it with- I don't know if he signed it with your client, or as I say, I'm totally mixed up, but he signed it with one person, and his contractor services agreement was with another. And then it says at the end of the contractor services agreement that it gives us a hint about what there might be other documents. Warranty and insurance agreement. Remember, we were discussing what other- And that's correct. I do think there was a warranty. We don't know anything about what else, except we know 25 pages, but we don't know how many- That's all that's in the record, except for what's in the agreement itself. That's all that's in the record. I think this court has held that reformation of a contract whether it's due to a scrivener's error or mutual mistake, that is a remedy for a court in equity to do, and that's from the Blackshear v. Reliance case. And if this is not a scrivener's- This is a clerical mistake. If it's not a scrivener's error, it's a mutual mistake because Mr. Weckleser had to have been planning to arbitrate with Knight, and Knight assumed- Jeffrey Knight didn't plan to arbitrate with Mr. Weckleser because he didn't know him. So there was a mutual mistake there, and I think that reformation for the intent of the parties is called for. I think the purpose of the two- I do think the purpose of the two documents are the same. It's so Mr. Weckleser could work for Knight. He could provide services for Knight, and he could get paid for those services. And in fact, in the arbitration rider, it says that's the consideration for the arbitration rider. The services Mr. Weckleser is going to provide and the payment he's going to receive, and that's in the first paragraph. This rider is delivered as an inducement to each other and is supported by additional services provided by the contractor, which would be Mr. Weckleser, and payments by Knight. Mr. Weckleser didn't provide any services to Jeffrey Knight. I think that's clear. He didn't receive any payment from Jeffrey Knight. All the payment he received was from Knight, from the subsidy. And that's the consideration for entering into the arbitration rider. Okay. Thank you. Any other questions? Thank you. We will come down and we'll ask our clerk to adjourn court, and then we'll come down and brief the board.
judges: Diana Gribbon Motz, William B. Traxler, Jr., Albert Diaz